IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOMINIC W. o/b/o SOFIA W., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-00327 |
| | ) |
| THE NORTHERN TRUST COMPANY | ) |
| EMPLOYEE WELFARE BENEFIT PLAN | ) |
| and HEALTH CARE SERVICE | ) |
| CORPORATION, d/b/a | ) |
| BLUE CROSS BLUE SHIELD OF | ) |
| ILLINOIS, | ) |
| | ) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT**

Now comes the plaintiff, DOMINIC W. as the next friend on behalf of his minor daughter, SOFIA W. ("Plaintiff"), by attorneys, MARK D. DEBOFSKY, MARIE E. CASCIARI, and DEBOFSKY, SHERMAN, & CASCIARI, P.C., and complaining against the defendants, THE NORTHERN TRUST COMPANY EMPLOYEE WELFARE BENEFIT PLAN ("Plan") and HEALTH CARE SERVICE CORPORATION, d/b/a BLUE CROSS BLUE SHIELD OF ILLINOIS ("HCSC") (collectively "Defendants"), states as follows:

**JURISDICTION AND VENUE**

1.  Jurisdiction of this Court is based upon the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. § 1001 *et seq.*), and in particular, ERISA §§ 502(e)(1) and (f) (29 U.S.C. §§ 1132(e)(1) and (f)). Those provisions give the district court jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan, which, in this case, involves a self-funded group health plan that is part of the Plan, and administered by

HCSC for the benefit of Northern Trust Corporation ("Northern Trust") employees and their dependents.

2.	This action may also be brought before the district court pursuant to 28 U.S.C. § 1331, which provides subject matter jurisdiction over actions that arise under the laws of the United States.

3.	Venue is proper in the Northern District of Illinois, Eastern Division pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) and 28 U.S.C. § 1391, as the Plan was administered in this District.

4.	The ERISA statute provides, at ERISA § 503 (29 U.S.C. § 1133), a mechanism for internal appeals of denied benefit claims. Those avenues of appeal have been exhausted.

## NATURE OF ACTION

5.	This action is brought as a claim for health benefits under ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)). Plaintiff also seeks attorneys' fees under ERISA § 502(g) (29 U.S.C. § 1132(g)).

## PARTIES

6.	At all times relevant hereto, Plaintiff, who is currently age 15, and was age 12 when she began to incur the residential mental health treatment at issue here, is and was a resident of Scottsdale, Arizona. Incident to Plaintiff's father's employment with Northern Trust, which is headquartered in Chicago, Illinois within the Northern District of Illinois, Eastern Division, and Plaintiff's status as her father's dependent, Plaintiff received dependent health coverage under the Plan as a "beneficiary" as defined by ERISA § 3(8) (29 U.S.C. § 1002(8)).

7.	At all times relevant hereto, the Plan constituted an "employee welfare benefit plan" as defined by ERISA § 3(1) (29 U.S.C. § 1002(1)). Plaintiff specifically seeks healthcare benefits

due under the group medical plan that is a part of the Plan (and attached hereto is a true and correct copy of the 2017 summary plan description for that group medical plan, which is incorporated herein by that reference as Exhibit "A").

8. At all times relevant hereto, HCSC was the claim administrator for at least the group medical plan component of the Plan, was a corporation with its principal place of business in the State of Illinois, and was doing business within the Northern District of Illinois, Eastern Division.

## RELEVANT PLAN PROVISIONS

9. The plan terms applicable to Plaintiff's claim for residential mental health treatment provide as follows:

### CLAIM ADMINISTRATOR'S MENTAL HEALTH UNIT

The Claim Administrator's Mental Health Unit has been established to assist in the administration of Mental Illness and Substance Use Disorder Rehabilitation Treatment benefits, including Preauthorization review, Emergency Mental Illness or Substance Use Disorder Admission Review and length of stay/service review for your Inpatient Hospital admissions and/or Outpatient services for the treatment of Mental Illness and Substance Use disorders. The Mental Health Unit has staff which includes Physicians, Psychologists, Clinical Social Workers and registered nurses…

### MEDICALLY NECESSARY DETERMINATION

The decision that Inpatient Hospital admission, Outpatient service, or other health care services or supplies are not Medically Necessary, as such term is defined in this benefit booklet, will be determined by the Mental Health Unit. If the Mental Health Unit Physician concurs that the Inpatient Hospital admission, Outpatient service, or other health care service or supply does not meet the criteria for Medically Necessary care, some days, services, or the entire hospitalization will be denied…

**The Mental Health Unit does not determine your course of treatment or whether you receive particular health care services. The decision regarding the course of treatment and receipt of particular health care services is a matter entirely between you and your Behavioral Health Practitioner. The Mental Health Unit's determination of Medically Necessary care is limited to merely whether a proposed admission, continued hospitalization, Outpatient**

3

> **service or other health care service is Medically Necessary under the Health Care Plan.**
>
> In the event that the Mental Health Unit determines that all or any portion of an Inpatient Hospital admission, Outpatient service, or other health care service or supply is not Medically Necessary, the Claim Administrator will not be responsible for any related Hospital or other health care service or supply charge incurred.
>
> **Remember that your Health Care Plan does not cover the cost of hospitalization or any health care services and supplies that are not Medically Necessary. The fact that your Behavioral Health Practitioner or another health care Provider may prescribe, order, recommend or approve an Inpatient Hospital admission, Outpatient service or other health care service or supply does not of itself make such hospitalization, service or supply Medically Necessary. Even if your Behavioral Health Practitioner prescribes, orders, recommends, approves, or views hospitalization or other health care services or supplies as Medically Necessary, the Claim Administrator will not pay for the hospitalization, services or supplies if the Mental Health Unit Physician determines they were not Medically Necessary.**

Ex. A at 40 & 42-43.

### SPECIAL CONDITIONS AND PAYMENTS

> There are some special things that you should know about your benefits should you receive any of the following types of treatments…
>
> **MENTAL ILLNESS AND SUBSTANCE USE DISORDER SERVICES**
>
> Benefits for all of the Covered Services described in this benefit booklet are available for the diagnosis and/or treatment of a Mental Illness and/or Substance Use Disorder. Treatment of a Mental Illness or Substance Use Disorder is eligible when rendered by a Behavioral Health Practitioner working within the scope of their license. Covered Services rendered in a Non-Administrator Provider facility will be paid at the Non-Participating Provider facility payment level.

Ex. A at 65 & 74.

10. The Plan defines the following relevant terms referenced and/or incorporated in into the plan provisions cited above as follows:

> MENTAL ILLNESS…..means those illnesses classified as disorders in the current *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association.

4

"Serious Mental Illness"…..means the following mental disorders as classified in the current *Diagnostic and Statistical Manual* published by the American Psychiatric Association:

(i) Schizophrenia;
(ii) Paranoid and other psychotic disorders;
(iii) Bipolar disorders (hypomanic, manic, depressive and mixed);
(iv) Major depressive disorders (single episode or recurrent);
(v) Schizoaffective disorders (bipolar or depressive);
(vi) Pervasive developmental disorders;
(vii) Obsessive-compulsive disorders;
(viii) Depression in childhood and adolescence;
(ix) Panic disorder;
(x) Post-traumatic stress disorders (acute, chronic, or with delayed onset); and
(xi) Anorexia nervosa and bulimia nervosa.

RESIDENTIAL TREATMENT CENTER…..means a facility setting offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision, structure and is licensed by the appropriate state and local authority to provide such service. It does not include halfway houses, supervised living, group homes, wilderness programs, boarding houses or other facilities that provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facilities. Patients are medically monitored with 24 hour medical availability and 24 hour onsite nursing service for patients with Mental Illness and/or Substance Use Disorders. Requirements: the Claim Administrator requires that any Mental Illness and/or Substance Use Disorder Residential Treatment Center must be licensed in the state where it is located, or accredited by a national organization that is recognized by the Claim Administrator as set forth in its current credentialing policy, and otherwise meets all other credentialing requirements set forth in such policy.

Ex. A at 27 & 31-32.

## STATEMENT OF FACTS

### Plaintiff's Medical and Treatment History

11. Plaintiff first began exhibiting mental health issues during her infancy and early childhood, including developing symptoms of anorexia as early as nine or ten, and engaging in stealing as young as five or six. Since then, Plaintiff has been diagnosed with reactive attachment disorder; disruptive mood dysregulation disorder; parent-child relational problems; severe

5

depressive disorder; severe oppositional defiant disorder; disruptive, impulsive control, and conduct disorder; insomnia disorder; and cognitive deficits. On account of those conditions, Plaintiff engaged in self-harming and outwardly aggressive, even violent, behavior. Plaintiff's diagnoses are recognized mental health conditions encompassed within the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V"), and are defined as severe mental illnesses under applicable federal and state law, specifically the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA") (29 U.S.C. § 1185a) and Illinois law on "Mental and Emotional Disorders" (215 ILCS 5/370c).

12. Plaintiff's biological mother suffered from severe chronic depression while Plaintiff was in utero, and gave Plaintiff to an adoption agency the night she was born. Since being adopted at six-weeks old, Plaintiff cried daily and uncontrollably until the age of five. However, as she aged, Plaintiff's behavior and tantrums of screaming, crying, and yelling only worsened.

13. In February 2014, at age 10, Plaintiff began seeing a child therapist, Jennifer Kaye, L.C.S.W., in both one-on-one and family therapy sessions. Those sessions were ultimately unproductive, and per the recommendation of Plaintiff's pediatrician, Nancy Horlick, M.D., was then evaluated by child psychiatrist, Houshang Aminian, M.D. Dr. Aminian ultimately prescribed an antipsychotic/antidepressant medication, but Plaintiff continued to be uncooperative and her condition did not improve.

14. Accordingly, in October 2014, Plaintiff's parents had her evaluated by psychiatrist, Linda Kalivas, M.D., who concluded that Plaintiff suffered from disruptive mood dysregulation disorder. Dr. Kalivas treated Plaintiff regularly until March 2016, during which time Plaintiff's

6

medications were changed several times, but without any impact on the frequency or intensity of her combative and enraged behavior.

15. On account of her mental health condition, Plaintiff had difficulty sustaining relationships with her peers, and by the fall of 2015, her outbursts and mental health condition had significantly deteriorated. Around that time, Plaintiff also began physically abusing her mother, and regularly screaming aloud outside for help.

16. In March 2016, Plaintiff's mental health problems escalated further despite her ongoing outpatient mental health treatment. Plaintiff cried uncontrollably both at school and at home, refused to take her medications, was physically destructive and abusive toward her mother, and began making suicidal and homicidal claims to her parents, including swinging a hammer at her mother's head.

17. Later in March 2016, Plaintiff again threatened to take her mother's life while she was sleeping, and shortly thereafter, on March 29, 2016, was admitted to Falcon Ridge Ranch ("Falcon Ridge") for residential mental health treatment. At the time of her admission, Plaintiff's diagnoses included disruptive mood dysregulation disorder, parent-child relational problems, reactive attachment disorder, and insomnia.

18. At Falcon Ridge, Plaintiff received intensive mental health treatment including, but not limited to, individual, family, group, and equine therapy; along with regular prescription medication management. Although Plaintiff experienced some improvement while admitted at Falcon Ridge, she remained severely impaired. For example, self-harming behaviors were noted in April and May 2016; Plaintiff was placed on multiple suicide watches in September and October 2016, and self-harm/safety watch multiple times in November and December 2016; and was then involved in a physical altercation with a peer in January 2017. During that time, Plaintiff also

engaged in restrictive eating and lost 11 pounds in just six weeks, as a result of which she weighed as little as 91 pounds in November 2016 and inpatient hospitalization was considered.

19. Accordingly, as of at least February 2017, it was noted by the medical staff at Falcon Ridge that while Plaintiff "demonstrates good progress in residential treatment, she continues to need residential treatment level of care. A lower level of care is not adequate to treat the severity and complexity of her problems."

20. On May 26, 2017, Plaintiff left Falcon Ridge for financial reasons even though discharge was not recommended by her treating providers. Plaintiff's discharge diagnoses still included reactive attachment disorder, major depressive disorder, and oppositional defiant disorder, as well as parent-child relational issues related to her adoption.

21. Following her discharge from Falcon Ridge, Plaintiff resumed outpatient psychotherapy and psychiatric treatment, which continues through the present. Plaintiff has demonstrated some improvement, as she was no longer suicidal, but still struggles with many aspects of her severe mental health condition and is now considering re-admission to Falcon Ridge for further residential health treatment.

**Plaintiff's Benefit Claim for Residential Treatment at Falcon Ridge**

22. Plaintiff submitted timely claims for coverage of her residential mental health treatment at Falcon Ridge under the Plan to HCSC, and HCSC initially approved coverage for that treatment starting March 29, 2016.

23. However, on April 28, 2016, after only one month of treatment at Falcon Ridge, HCSC denied further coverage, claiming that Plaintiff's treatment at Falcon Ridge was no longer medically necessary. HCSC expressly stated as follows:

> Per the medical necessity provision of your benefit booklet and/or summary plan description a medical necessity review has been completed. Based on the clinical

information provided, you did not meet MCG care guidelines for continued treatment at the Mental Health Residential Treatment (RTC) level of care for the following reasons: You were not reported as being an imminent danger to self or others. There was no evidence of inability to adequately care for yourself with functioning in multiple sphere areas. You were not reported as being aggressive or threatening. There was no report of medical instability. There was no report of psychosis or mania. From the clinical evidence, you can be safely treated in a less restrictive setting such as Mental Health Partial Hospital/Day Treatment (PHP). The last medically necessary date after this review is 04/27/16.

24. Plaintiff appealed HCSC's benefit determination on October 21, 2016, and submitted extensive medical documentation supporting her continued need for residential mental health treatment, but on November 16, 2016, HCSC denied Plaintiff's appeal, once again based on medical necessity. An unnamed psychiatrist at HCSC, who never even evaluated Plaintiff, reviewed her medical records and determined that she did not meet the guidelines for continued residential treatment at Falcon Ridge. HCSC specifically alleged as follows:

> Per the medical necessity provision of your benefit booklet and/or summary plan description a medical necessity review has been completed. Based on the clinical information provided, you did not meet MCG care guidelines for continued treatment at the Mental Health Residential Treatment (RTC) level of care for the following reasons: You were not an acute danger to yourself or others. There was no report of psychosis or mania. There was no report of medical instability. You were not on medications. You had supportive family. You did not require 24 [hour] nursing, medical, psychiatric, or behavioral care. From the clinical evidence, you could have been safely treated in a less restrictive setting such as Mental Health Partial Hospital/Day Treatment (PHP). The last medically necessary date after this review remains 04/27/16.

25. On March 13, 2017, Plaintiff requested an external review of HCSC's denial of coverage for the residential mental health treatment she was receiving at Falcon Ridge, and submitted additional medical evidence further supporting the appropriateness, medical necessity, and emergency need for that treatment. That evidence included many of the same medical reports submitted with Plaintiff's first level appeal, along with updated medical information. It more specifically included, but was not limited to, the following:

9

- On May 2, 2016, psychologist, Dylan Matsumori, Ph.D., evaluated Plaintiff and explained:

  It is recommended that Sofia continue in a multifaceted residential treatment program. The program needs to include individual, group and family counseling, as well as, academics and a behaviorally based structure. This will allow her to have the stability and safety necessary to reflect upon, understand and process her past behaviors, thought and emotions while identifying her sense of self and developmental direction/goals.

- On August 15, 2016, Plaintiff's former treating child psychiatrist, Linda Kalivas, M.D., documented:

  Sofia has a history of frequent outbursts, rages and conflicts with her adoptive family. She has expressed violent behavior toward herself and her family members and has threatened suicide, as well as, harm toward her adoptive mother.

  Her previous psychologist and myself treated Sofia with Abilify and Seroquel. Despite careful dosage titrations, she did not significantly improve. She was extremely resistant to treatment with her therapist and myself…Sofia was deteriorating in out-patient treatment. Her outbursts intensified [,] and her threats of harm escalated. She clearly needed a higher, more intensive, level of care.

  It is my medical opinion that Sofia would benefit from continued residential treatment at Falcon Ridge Ranch. It is the only chance she has of developing the emotional awareness and life skills needed to function independently and to develop a positive relationship with her adoptive family.

- On August 23, 2016, Plaintiff's pediatrician, Nancy Horlick, M.D., described Sofia's mental condition and necessity for treatment at Falcon Ridge as follows:

  She has had longstanding, greater than 6 years, issues with behavior. She suffers from depression and severe mental health issues. The family has exhausted many psychiatric providers, medications, outpatient treatments, and my ability to help Sofia. She has been in and out of schools and homeschooled and cannot maintain relationships with her peers. She has had paranoid thoughts and has threatened many times to hurt her mother. Nothing has helped or changed these actions.

10

> It is clear that this child needs major assistance in learning coping skills. She has fits of rage, aggression and destruction, which are a hazard to herself and her family. There is no other mechanism of action that can provide adequate and long lasting assistance to her and her family other than long term, inpatient residential care. She has not and cannot improve her life and that of her family in an outpatient setting.

- On September 26, 2016, Falcon Ridge mental health counselor, Amanda Nelson, M.H.C., provided the following insight into Plaintiff's progress at Falcon Ridge and need for continued treatment:

> At the time of admission, [Sofia's] parents indicated they were unable to govern her disruptive behavior within the home, which was becoming increasingly dangerous. Sofia made homicidal threats toward her mother prior to and during the admission process. Within days of treatment she showed episodes of "rage" and made homicidal and suicidal statements…Since admission to Falcon Ridge Ranch in March of 2016, [Sofia] shows significant improvements in mood, behavior, social skills, and relationships with her parents…Prior treatment was not successful because of the complexity of [Sofia's] needs, particularly, she would not participate in lower levels of care, as noted by previous and current providers. Residential treatment is necessary to provide comprehensive resources, which provide safety, structure, and support. Because of the severity of behavioral and emotional problems, the home environment was not emotionally and physically safe for [Sofia] and her family members…Placement in a residential facility provides immediate and comprehensive intervention to manage crisis behaviors. At a safe distance, family members can learn skills to maintain the safety within their home, by using attachment based relationship building skills.

> The structure of residential treatment is necessary to foster self-management skills and externalize problems away from the parent-child relationship with the support of a residential setting outside the family home…Prior treatment failed, because family, providers, teachers, and social workers did not provide collaborative support. [Sofia] and family members did not have immediate, collaborative, and adequate support for the complex portrait of chronic and acute clinical problems…[Sofia] shows overall improved mood, however she continues to struggle with depression. She is currently on a safety and security watch, because she was making suicidal statements to staff members. She shows impaired social skills and she continued to be targeted as a victim of bullying.

> A multidisciplinary team is necessary to meet [Sofia's] therapeutic, psychiatric, academic, social, and residential needs, while providing comprehensive and collaborative support. 12 months of residential treatment is recommended to treat [Sofia].

- On October 14, 2016, Falcon Ridge psychiatrist, Michael Stevens, M.D., similarly stated:

> It is clear from the history that I have that a number of different efforts were made to treat her in outpatient settings. She clearly became a real danger towards other family members, in particular throwing a hammer at her mother and other physically aggressive actions and represented a real – particularly life-threatening – risk to her mother. In addition, her ongoing depression and her suicidal talk, which her father described to me, took place before she came to Falcon Ridge Ranch, and was a potential threat to her own wellbeing and potentially to her life. The home environment clearly was (from the objective information available) emotionally and physically unsafe for both Sophia and her family members. At that point in time, a residential treatment was recommended and subsequently occurred. The structure of residential treatment has been described by her therapist, and includes a program in which self-management of emotions and behavioral skills are taught…It is clear from the intensity of conflict that was ongoing as long as Sophia was in the home, as well as dangerous to both herself and her family members, that this is not something that could have occurred in that setting. She had failed a number of efforts at lower levels of care as well…

> I would note that in regards to her psychiatric evaluation that was carried out by Dr. Draper, who was treating psychiatrist at Falcon Ridge Ranch when [Sofia] was admitted – he evaluated her on April 7, 2016 – he…concluded that [Sofia] did require treatment and 24 hour care. He noted that the uninterrupted conflict and ongoing conflict, both with her mother and other family members but a lot of it was focused on her mother, would prevent her from progressing, as it had in the past, if she was not separated from her family for a period of time…

> I evaluated [Sofia] on September 22, 2016, as Dr. Draper developed an acute medical condition and I took over all psychiatric care…it is my clinical opinion that it is medically necessary for [Sofia] to be in a structured living environment away from her family at this time. I do not believe that psychiatric hospitalization is indicated. It is my belief that residential treatment is the appropriate level of care.

Ms. Nelson and Dr. Stevens both endorsed Plaintiff's need for ongoing residential mental health treatment in February 2017, and explained that due to the complexity of her mental health

condition, behavioral dangerousness, and refractoriness to other less invasive treatment methods, "even with partial hospitalization treatment, the problems would compound."

26. On May 8, 2017, an unidentified psychiatrist, who also never examined Plaintiff, performed the external review of Plaintiff's March 13, 2017 appeal for MCMC. The psychiatrist noted that Plaintiff "had lifelong psychological and functional problems that worsened over time until she was presenting a risk to her family members prior to her residential center admission;" and "was sometimes on 'suicide watch'" and "disciplined for noncompliant or resistant or disruptive behaviors periodically every month from 09/2016 through 02/2017." Nonetheless, HCSC's benefit determination was upheld because "Residential Treatment Centers are a Plan exclusion."

27. After intervention by Northern Trust, on June 1, 2017, an addendum to the external review decision was prepared, and at that time, alleged that "the requested health service 04/28/2016-current was not medically necessary…The patient could have been treated at a less intensive level of treatment. The patient was stabilized, she was volunteering, attending equine therapy and had no SI/HI tendencies." That decision was not transmitted to Plaintiff until July 6, 2017.

28. All required pre-litigation appeals seeking the payment of health benefits for the residential mental health treatment Plaintiff received while she was admitted at Falcon Ridge from April 28, 2016 to May 27, 2017 have now been exhausted pursuant to ERISA § 503 (29 U.S.C. § 1133). Therefore, this matter is ripe for judicial review.

29. Moreover, contrary to the reasons asserted by HCSC, the services at issue, i.e., the residential mental health treatment Plaintiff received while admitted at Falcon Ridge between April 28, 2016 and May 27, 2017 was medically necessary and should have been covered under

13

the Plan. To the extent Plaintiff's treatment had been covered under the Plan, but at a lesser rate or for a shorter period of time than comparable medical or surgical healthcare benefits, Defendants violated the MHPAEA, as well as Illinois state law on "Mental Health and Addiction Parity" (215 ILCS 5/370c.1), which require that the Plan cover mental health treatment on the same terms, at the same rates, and for the same duration of time that apply to comparable medical or surgical healthcare benefits.

30. Plaintiff and her family have improperly incurred unreimbursed expenses for that treatment in the total approximate amount of $170,000.00 that should have been covered and/or reimbursed under the Plan. As a direct and proximate result thereof, Plaintiff states a claim for benefits due under the terms of an employee welfare benefit plan and is entitled to recover all the expenses incurred thereunder that were not reimbursed, as well as the costs of this suit and the attorneys' fees.

**RELIEF SOUGHT**

WHEREFORE, Plaintiff prays for the following relief:

A. That the Court enter judgment in Plaintiff's favor and against Defendants, and order Defendants to reimburse Plaintiff in an amount equal to the contractual amount of health benefits to which Plaintiff is entitled, i.e., for the approximately $170,000.00 in total charges incurred for treatment at Falcon Ridge that should have been covered under the Plan;

B. That the Court order Defendants to pay Plaintiff prejudgment interest on all past due health benefits that have accrued prior to the date of judgment;

C. That the Court award Plaintiff attorneys' fees pursuant to ERISA § 502(g) (29 U.S.C. § 1132(g)); and

      D.      That the Court award Plaintiff any and all other penalties, damages, and equitable relief to which Plaintiff may be entitled, as well as the costs of suit.

Dated: October 25, 2018

Respectfully submitted,

/s/ Marie E. Casciari

_____

Marie E. Casciari
One of the Attorneys for Plaintiff
Dominic W. o/b/o Sofia W.

Mark D. DeBofsky
Marie E. Casciari
DeBofsky, Sherman & Casciari, P.C.
200 West Madison Street, Suite 2670
Chicago, Illinois 60606
Voice (312) 561-4040
Fax (312) 929-0309
Email mdebofsky@debofsky.com
Email mcasciari@debofsky.com

15

## **CERTIFICATE OF SERVICE**

TO: Cardelle Bratton Spangler
       Jasmine A. D. Fannell
       Winston & Strawn LLP
       35 West Wacker Drive, Suite 3130
       Chicago, Illinois 60601
       Email cspangler@winston.com; jfannell@winston.com

       Martin J. Bishop
       Rebecca R. Hanson
       Meredith A. Shippee
       Reed Smith LLP
       10 South Wacker Drive, 40th Floor
       Chicago, Illinois 60606
       Email mbishop@reedsmith.com; rhanson@reedsmith.com; mshippee@reedsmith.com

The undersigned attorney hereby certifies that on October 25, 2018, she electronically filed the foregoing FIRST AMENDED COMPLAINT with the Clerk of the Court using the CMF/ECF filing system, which sent notice of such filing to the above-named attorneys.

                                        /s/ Marie E. Casciari
                                        _____
                                        Marie E. Casciari
                                        One of the Attorneys for Plaintiff
                                        Dominic W. o/b/o Sofia W.

Mark D. DeBofsky
Marie E. Casciari
DeBofsky, Sherman & Casciari, P.C.
200 West Madison Street, Suite 2670
Chicago, Illinois 60606
Voice (312) 561-4040
Fax (312) 929-0309
Email mdebofsky@debofsky.com; mcasciari@debofsky.com