**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DOMINIC W. on behalf of SOFIA W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 327** |
| | ) | |
| **THE NORTHERN TRUST COMPANY** | ) | |
| **EMPLOYEE WELFARE BENEFIT** | ) | |
| **PLAN and HEALTH CARE SERVICE** | ) | |
| **CORPORATION, d/b/a BLUE CROSS** | ) | |
| **AND BLUE SHIELD OF ILLINOIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Dominic W. is an employee of the Northern Trust Company. On behalf of his minor daughter, Sofia W., he has sued the Northern Trust Company Employee Welfare Benefit Plan and the plan's administrator, Health Care Service Corporation, which does business as Blue Cross and Blue Shield of Illinois. Dominic alleges that the plan and Blue Cross improperly refused to cover residential treatment for Sofia's mental health issues after Blue Cross erroneously concluded that residential treatment was no longer medically necessary. Both sides have moved for summary judgment.

**Background**

The following facts are drawn from the claim file and are undisputed except where otherwise noted.

## A. Coverage of residential treatment under the employee benefit plan

Sofia is a beneficiary of her father's employer-provided health insurance, the Northern Trust Employee Benefit Plan. The plan is governed by the Employee Retirement Income Security Act (ERISA) and is administered by Blue Cross.

Although different versions of the plan were in effect in 2016 and 2017, in both years the plan covered care in residential treatment facilities so long residential treatment was "medically necessary." In 2016, the plan defined "medically necessary" to mean that the treatment must

> be ordered by a physician; be consistent with the symptoms, diagnosis and treatment of your illness or injury; be recognized by the medical community as the appropriate and acceptable course of treatment; be given to you as an inpatient only when services cannot be safely be provided as an outpatient; not be provided solely for the convenience of your physician, hospital, other provider or you; not be educational or investigational; and not be provided primarily for research.

2016 Sourcebook, dkt. no. 87–18, at PLAN000106. In 2017, a "medically necessary" service was one that was "required, in the reasonable medical judgment of the Claim Administrator, for the treatment or management of a medical symptom or condition." 2017 Benefit Booklet, dkt. no. 87–18, at PLAN000443. In addition, the service must have been "the most efficient and economical service which [could] safely be provided." *Id*. The parties agree that at all relevant times the plan gave the administrator discretion to determine what treatments were medically necessary.[1]

## B. Sofia's medical history

Sofia was adopted as an infant. As a young child, she began exhibiting

---

[1] Although the definitions of "medically necessary" differed in 2016 and 2017, the parties appear to agree that the differences in those definitions do not bear on the outcome of the case.

behavioral problems, including emotional instability, severe temper tantrums, and defiance. At the age of 10, she started seeing a child therapist. Her pediatrician, Dr. Nancy Horlick, also recommended that she visit a child psychiatrist, Dr. Houshang Aminian. Dr. Aminian prescribed Abilify, an antipsychotic and antidepressant medication. In October 2014, Sofia began seeing a second psychiatrist, Dr. Linda Kalivas. Dr. Kalivas diagnosed Sofia with disruptive mood dysregulation disorder and adjusted the prescribed dosage of Abilify.

Outpatient treatment did not prevent Sofia's condition from deteriorating. By March 2016, twelve-year-old Sofia's behavior was increasingly disruptive and dangerous. She cried uncontrollably at home and at school, refused to take her medication, entered periods of extreme rage during which she would scream at the top of her lungs, and expressed suicidal thoughts. Her emotional outbursts reached an apex when she swung a hammer at her mother's head. Soon thereafter, Sofia told her mother that she planned to kill her in her sleep.

## C.   Admission to residential treatment

On March 29, 2016, the day after Sofia threatened to kill her mother, her parents brought her to Falcon Ridge Ranch, a residential treatment center in Utah for adolescent girls. On April 7, she underwent an initial psychiatric evaluation with Dr. Randall Draper. Dr. Draper found that Sofia suffered from disruptive mood dysregulation disorder, reactive attachment disorder, and a parent-child relational problem. He wrote in his evaluation that she required "treatment in a setting away from her home, where the specific and focused dysfunctional interaction with her mother appears to be the main issue." Dr. Draper Evaluation, dkt. no. 87–1, at

3

BCBSIL_0000243.  Dr. Draper further explained that "[t]reatment in a less restrictive environment, such as participation in outpatient treatment, is unlikely to be successful, since it would entail living at home and uninterrupted antipathetic interactions with her mother." *Id.*  On this basis, Dr. Draper concluded that Sofia "requires a residential level of care." *Id.* at BCBSIL_0000224.

On April 13, 2016, Falcon Ridge therapist Amanda Nelson described Sofia's condition in a therapy progress note.  *See* Progress Note of Apr. 13, 2016, dkt. no. 87–1, at BCBSIL_0000708.  Among other observations, Nelson noted that Sofia denied "suicidal or harm-ideation" but wrote that she showed "a pattern of oppositional and defiant behavior." *Id.*  In a progress note the following week, Nelson remarked, "Parents are supportive of the therapeutic process."  Progress Note of Apr. 18, 2016, dkt. no. 87–1, at BCBSIL_0000702.

**D.    Initial coverage decisions and subsequent residential treatment**

In April 2016, Sofia's father Dominic submitted to Blue Cross a timely claim for coverage of Sofia's residential treatment at Falcon Ridge.  Blue Cross initially approved the request on April 14, relying on the opinion of one of its consulting psychiatrists, Dr. Rakesh Chadalavada.  Dr. Chadalavada spoke with a Falcon Ridge clinician whom the medical records identify only as "Terri G."  Dr. Chadalavada found that Sofia met the criteria for residential treatment under the Milliman Care Guidelines, the treatment standards Blue Cross uses to determine whether a particular health care service is medically appropriate.  He cited Sofia's history "of extreme aggression at home" as a basis for approving residential treatment and noted that although she was "not showing any behaviors that she exhibited with the family, . . . she has not [been] in much contact

with the family."  Dr. Chadalavada Review, dkt. no. 87–7, at BCBSIL_0005924.  He also noted the apparent absence of suicidal or homicidal ideation.

Two weeks later, on April 28, 2016, Blue Cross reversed its coverage decision, stating that Sofia no longer met the Milliman Care Guidelines for mental health residential treatment.  Specifically, Blue Cross gave the following reasons for denying ongoing coverage:

> You were not reported as being an imminent danger to self or others. There was no evidence of inability to adequately care for yourself with functioning in multiple sphere areas.  You were not reported as being aggressive or threatening.  There was no report of medical instability. There was no report of psychosis or mania.  From the clinical evidence, you can be safely treated in a less restrictive setting such as MENTAL HEALTH PARTIAL HOSPITAL/DAY TREATMENT (PHP).

Coverage Decision of Apr. 28, 2016, dkt. no. 87–1, at BCBSIL_0000314.  Blue Cross determined that the last day of medically necessary residential treatment was April 27.

Blue Cross based its decision to terminate coverage on the opinion of consulting psychiatrist Dr. Aftab Qadir.  Dr. Qadir did not evaluate Sofia, but he spoke with Terri G., the Falcon Ridge clinician.  Dr. Qadir stated that he also reviewed "[e]xisting clinical notes," Dr. Qadir Review, dkt. no. 87–3, at BCBSIL_0002301, though the plaintiff disputes that claim.  It is undisputed, however, that at most Dr. Qadir reviewed clinical notes dating back to Sofia's admission to Falcon Ridge and did not base his opinion on any other medical records.

In his written opinion, Dr. Qadir noted that Sofia was "making progressive improvements" and "opening up," and he reported that her "[r]ecent family session was pleasant."  *Id.*  He also wrote that Sofia "did not express her [homicidal ideation] toward parents" and noted that her sleep had improved.  *Id.*  Dr. Qadir concluded that she did not appear to pose a risk to herself or others, she was medically stable, she evinced no

5

psychosis or mania, and no aggressive, threatening, or violent behavior had been reported.

### E.    Ongoing residential treatment and self-harming behavior

Sofia continued to receive residential treatment at Falcon Ridge despite Blue Cross's determination that it was not medically necessary for her to remain there.  On May 2, 2016 psychologist Dylan Matsumori, Ph.D., wrote a report based on two psychological evaluations of Sofia he conducted in April.  In stating his conclusions about the appropriate treatment plan, Dr. Matsumori wrote,

> It is recommended that Sofia continue in a multifaceted residential treatment program.  The program needs to include individual, group and family counseling, as well as[] academics and a behaviorally based structure.  This will allow her to have the stability and safety necessary to reflect upon, understand and process her past behaviors, thought and emotions while identifying her sense of self and developmental direction/goals.

Dr. Matsumori Evaluation, dkt. no. 87–1, at BCBSIL_0000577.  Dr. Matsumori also found that Sofia struggled to "face her shortcomings frankly," explaining, "Care must be taken in this regard not to be deceived by her superficial compliance with these efforts." *Id.*

In May and June 2016, Sofia continued to have difficulties with behavior management, anxiety, depression, and low self-image.  Her therapy progress reports reflect, however, that she denied harming herself or experiencing suicidal ideation. Reports of her physical health status in July and August also indicate that she had not engaged in self-harming behaviors.

But Sofia's psychological symptoms did not fully abate, and indeed, in the autumn of 2016 they appear to have to worsened considerably.  By October 3, 2016, one therapist observed, "Sofia shows increasing oppositional behavior and poor mood.

She shows a loss of focus and investment in her treatment program."  Clinical Report of Oct. 3, 2016, dkt. no. 87–1, at BCBSIL_0000481.  From September through December 2016, Sofia was placed on suicide watch on five occasions.  On September 28, Amanda Nelson, Sofia's therapist at Falcon Ridge, noted that she had been on self-harm watch but that she measured low for suicide risk.  On October 11, Nelson wrote that Sofia had again been placed on self-harm watch after making suicidal statements but continued to deny having suicidal thoughts.  Nelson also mentioned that a Falcon Ridge staff member had expressed concern to Nelson that Sofia "was using Suicide Watch to manipulate this therapist."  Progress Note of Oct. 11, 2016, dkt. no 87–1, at BCBSIL_0000377.

Sofia was placed on self-harm watch again in November after she showed "restrictive eating behavior"—that is, she was refusing to eat—and lost eleven pounds in six weeks.  Even after she began eating again, Falcon Ridge staff found notes Sofia had written expressing a desire to harm herself.  On November 28, Sofia cut herself on the arm and leg using a broken light bulb.  She was placed on self-harm watch until December 2.  And on December 27, 2016, Sofia was placed on self-harm watch once again after Falcon Ridge staff discovered that she had been hiding a fork in her room, which they feared she could have used to harm herself.  Sofia denied any intent to harm herself on that occasion.

Sofia continued to struggle in 2017.  In January, she became involved in a physical altercation with another patient at Falcon Ridge who struck her in the face.  She also continued engaging in oppositional behavior, including lying and manipulation, and expressing suicidal thoughts, apparently without a plan.  On February 2, Dr.

Michael C. Stevens, who took charge of Sofia's psychiatric care after Dr. Draper developed a serious medical problem, prescribed her Seroquel, an anti-psychotic and anti-depressant. Sofia refused to take the medication.

Sofia remained at Falcon Ridge until May 26, 2017, when she was discharged for financial reasons. At that time, her treating physicians did not recommend discharge.

## F. Coverage appeals

On October 21, 2016, Sofia's father Dominic appealed Blue Cross's benefit determination. He submitted a sixteen-page letter describing Sofia's mental and emotional problems, outlining her treatment history, and summarizing the medical evidence that, in his view, substantiated her need for residential treatment. Dominic attached to his letter of appeal four letters from doctors and therapists who had treated Sofia. In one letter, Sofia's pediatrician, Dr. Horlick, described Sofia's emotional and behavioral problems, including "fits of rage, aggression and destruction, which are a hazard to herself and her family," and opined that Sofia "has not [improved] and cannot improve her life and that of her family in an outpatient setting." Dr. Horlick Letter of Medical Necessity, dkt. no. 87–1, at BCBSIL_0000583.

A second letter, from Sofia's psychiatrist Dr. Kavilas, noted that "Sofia was deteriorating in out-patient treatment. Her outbursts intensified and her threats of harm escalated. She clearly needed a higher, more intensive, level of care." Dr. Kavilas Letter of Medical Necessity, dkt. no. 87–1, at BCBSIL_0000585. Dr. Kavilas further opined that continuing residential treatment was "the only chance she has of developing the emotional awareness and life skills needed to function independently and to develop a positive relationship with her adoptive family." *Id.*

8

Dominic also submitted two letters from Sofia's providers at Falcon Ridge. Dr. Stevens detailed the years of unsuccessful efforts to address her mental illness through outpatient treatment, described her course of treatment at Falcon Ridge, and analyzed her various psychiatric diagnoses. He concluded, "[I]t is my clinical opinion that it is medically necessary for Sophia [*sic*] to be in a structured living environment away from her family at this time. . . . It is my belief that residential treatment is the appropriate level of care." Dr. Stevens Letter of Medical Necessity, dkt. no. 87–1, at BCBSIL_0000510.

In the fourth letter, Nelson, Sofia's therapist, opined that "12 months of treatment is recommended to treat [Sofia]." Nelson Letter of Medical Necessity, dkt. no. 87–1, at BCBSIL_0000338. She based this recommendation on the failure of outpatient treatment to meet Sofia's complex needs, especially given that "the home environment was not emotionally and physically safe for [Sofia] and her family members." *Id.* Nelson cited the structure and collaborative support associated with residential treatment, which she said were necessary in place of the unstructured and emotionally difficult context of Sofia's relationship with her parents.

On November 16, 2016, Blue Cross denied Dominic's appeal. It relied on the opinion of Dr. Timothy Stock, a consulting psychiatrist, who conducted a file review and found that Sofia did not meet the Milliman Care Guidelines for residential treatment. He noted that she was not on medication, had participated in various types of therapy at Falcon Ridge, and had been allowed to leave Falcon Ridge to attend events on two occasions. Dr. Stock also noted that Sofia had been "put on suicide precautions, but no active plan/intent or attempt." Dr. Stock Opinion, dkt. no. 87–3, at BCBSIL_0007392.

Based on these and other findings, he concluded that Sofia "did not require 24hr nursing, medical, psychiatric, or behavioral care," and that a less restrictive level of care was appropriate beginning on April 27, 2016. *Id.*

## G. Subsequent letters of medical necessity and file reviews

In February 2017, both therapist Nelson and Dr. Stevens wrote letters describing Sofia's continuing need for residential treatment. Dr. Stevens opined that "there is no substantial evidence to indicated [*sic*] that she does not continue to be unstable, and unpredictable behaviorally, and continues to be a risk in regards to her own safety, and the safety of others." Dr. Stevens Second Letter of Medical Necessity, dkt. no. 87–3, at BCBSIL_0002043. He also observed,

> Sofia is unusually complex, and unusually resistant to treatment adherence. It is my judgment that in the absence of out of home structure, she would quickly decompensate to acute dangerousness, in light of her refusal to consider medication treatment, as well as her history of a hostility towards her mother which cannot be explained by her mother's behavior. Although she does not articulate delusional beliefs about her mother, she clearly does not articulate her thoughts and feelings openly to anyone, as she has engaged in what I consider bizaare [*sic*] irritability, without identifiable stresses, that are associated with her rapid escalation to dangerous assaultive behaviors in the past.

*Id.* Sofia's hostility toward her mother, in Dr. Stevens's view, also meant that the fact that her family was supportive did not suggest that a lower level of care was appropriate. He concluded that "she will be, if returned home in the very near future, an acute danger to herself or others." *Id.* at BCBSIL_0002044.

Nelson's letter echoed many of Dr. Stevens's observations. Nelson also noted that Sofia tended to hide the severity of her disordered eating and self-harming behaviors. She also observed that Sofia sometimes refused to participate in therapy and had significant social challenges that were most appropriately addressed in

residential treatment. Based on these and other clinical observations, Nelson concluded that Sofia "continues to show that residential treatment is necessary to treat her complex needs." Nelson Second Letter of Medical Necessity, dkt. no. 87–3, at BCBSIL_0002049.

On March 13, 2017, Dominic requested an external review of Blue Cross's denial of coverage. Blue Cross approved that request and authorized an external file review by an anonymous evaluator. Blue Cross also authorized another internal review by consulting psychiatrist Dr. Benji Kurian.

Dr. Kurian's opinion, dated March 24, 2017, substantially mirrored the opinion of Dr. Stock. He found that Sofia did not meet the Milliman Care Guidelines for residential treatment because she was not a risk to herself or others. Like Dr. Stock, he noted that she had been put on suicide watch several times but that "no active plan/intent or attempt [was] noted." Dr. Kurian Opinion, dkt. no. 87–3, at BCBSIL_0002310. He also noted that Sofia's parents were supportive, she was not on medication, she had been participating in therapy, and she had been permitted to leave Falcon Ridge to attend two events.

In an opinion dated May 8, 2017, the external reviewer concluded that residential treatment was categorically excluded from coverage under the plan. The defendants acknowledge that this conclusion was erroneous. They attribute the error to an accidental ambiguity in the 2016 version of the plan that suggested that residential treatment was both covered and excluded from coverage. On June 1, 2017, the external reviewer issued an addendum to the earlier opinion. In the addendum, the reviewer concluded that residential treatment was not medically necessary. The

addendum states, "The patient could have been treated at a less intensive level of treatment. The patient was stabilized, she was volunteering, attending equine therapy and had no [suicidal ideation or homicidal ideation] tendencies." External Reviewer Addendum, dkt. no. 87–3, at BCBSIL_0001612.

In January 2018, Dominic filed this suit on his daughter's behalf under 29 U.S.C. § 1132(a)(1)(B), which permits the beneficiary of an ERISA plan to sue to recover benefits owed or enforce his rights under the plan.[2] Both sides have moved for summary judgment. For the reasons set forth below, the Court grants the plaintiff's motion and denies the defendants' motion.

## Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *United States v. Z Inv. Props.*, 921 F.3d 696, 699–700 (7th Cir. 2019). Because the parties agree that the terms of the benefit plan give the administrator the discretionary authority to determine benefits, the Court reviews Blue Cross's benefits decision under the arbitrary and capricious standard. *See Lacko v. United of Omaha Life Ins. Co.*, No. 18-2155, 2019 WL 2439786, at *4 (7th Cir. June 12, 2019). "Although that standard is necessarily deferential, it is not a rubber stamp," and the Court "will not uphold an administrator's decision when there is an absence of reasoning in the record to support it." *Id.* (internal quotation marks omitted). The arbitrary and capricious standard requires the plaintiff to show that the administrator's decision was unreasonable, not

---

[2] The initial complaint named Sofia as the plaintiff in this action, but her father was later substituted as the named plaintiff. Dkt. no. 66.

merely erroneous. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003); *see also Marrs v. Motorola, Inc.*, 577 F.3d 783, 786 (7th Cir. 2009) ("[T]he court can . . . reject the administrator's interpretation only if it is unreasonable ('arbitrary and capricious').").

In determining whether the administrator's decision was arbitrary and capricious, the Court considers whether the specific reasons for the denial of coverage were communicated to the claimant and whether the claimant was afforded an opportunity for full and fair review by the administrator. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). Among other factors, the Court considers whether the administrator engaged in "selective readings" of evidence "that are not reasonably consistent with the entire picture." *Id.* at 777.

## A.     Initial termination decision

Dominic argues that Blue Cross's determination on April 28, 2016 that Sofia no longer required residential treatment was arbitrary and capricious. He points out that about two weeks earlier Blue Cross had found that residential treatment *was* medically necessary. He also argues that the opinion of Dr. Qadir, on which Blue Cross relied, was based on an unreasonably limited and selective view of the medical evidence.

As the defendants note, the fact that Blue Cross had previously determined that residential treatment was medically necessary does not create a presumption in the plaintiff's favor, and "a reversal based on new information is not a nonuniform interpretation" of the plan. *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606–07 (7th Cir. 2007); *see also Holmstrom*, 615 F.3d at 767 ("The plan administrator is entitled to seek and consider new information and, in appropriate cases, to change its mind."). But the

Court does not read *Mote* and *Holmstrom* to permit an administrator to reverse course on whim without adequate justification or a reasonable evidentiary basis for the decision. Rather, "a plan's determination must still have a reasoned basis to survive judicial review, even under the deferential standard of review." *Holmstrom*, 615 F.3d at 774. And the decision to provide benefits in the first instance is "part of the overall set of facts" that the Court must consider. *Id.* at 767.

In this case, Dr. Qadir's opinion fails to cite new, medically relevant information that would reasonably justify reversing the benefits decision Blue Cross made just two weeks prior. First, Dr. Qadir relied on the fact that Sofia had not expressed homicidal ideation toward her parents in their recent family therapy session. But the fact that Sofia did not threaten to kill her parents in a particular therapy session while she was in residential treatment does not support a reasonable inference that it was no longer dangerous for her to live at home. Moreover, at the time Blue Cross initially found that residential treatment was medically necessary, the record evidence showed that Sofia did not admit to having violent thoughts. Specifically, Dr. Draper noted (in his report written a week before Blue Cross initially approved coverage) that Sofia denied "suicidal ideation or any interest in harming others." Dr. Draper Evaluation, dkt. no. 87–1, at BCBSIL_0000242. Dr. Chadalavada's opinion, on which Blue Cross based its decision to initially approve coverage, similarly reflects that Sofia denied any suicidal or homicidal ideation or psychosis. Thus the fact that she continued to deny suicidal or homicidal ideation does not constitute new evidence that her condition had improved.

Dr. Qadir's other stated bases for his conclusion provide little or no support for the determination that residential treatment had ceased to be medically necessary in the

14

preceding two weeks. He noted, for example, that Sofia was not on medication and that her sleep had improved. But Sofia had not been prescribed medication even at the time Dr. Chadalavada determined that residential treatment was medically necessary. *See* Dr. Chadalavada Opinion, dkt. no. 87–7, at BCBSIL_0005924 ("Patient is not on any medication at this time."). And Dr. Draper noted in his initial evaluation that Sofia denied having problems sleeping. *See* Dr. Draper Evaluation, dkt. no. 87–1, at BCBSIL_0000242. Dr. Qadir's conclusion that these findings showed that Sofia had significantly improved since Blue Cross first approved coverage thus has no basis in the medical evidence.

In addition, it was unreasonable for Blue Cross to rely on Dr. Qadir's opinion because it relied on a highly limited subset of the evidence. First, the defendants acknowledge that Dr. Qadir's decision was based only on a single conversation with Terri G., the Falcon Ridge clinician, and a review of the clinical notes.[3] Dr. Qadir thus did not review Sofia's full Falcon Ridge medical records. The defendants cite cases holding that administrators do not act arbitrarily and capriciously by failing to consider evidence that is not before them at the time of the decision. *See, e.g.*, *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001) ("[I]n evaluating a plan administrator's decision under an arbitrary and capricious standard of review, we should consider only the evidence that was before the administrator when it made its

---

[3] The plaintiff, citing the defendants' responses to written discovery, contends that Dr. Qadir did not review "clinical notes" and relied exclusively on "[m]edical information provided in real time by provider via telephone." Pl.'s Reply Br., dkt. no. 113, at 9. For the purposes of the plaintiff's motion for summary judgment, the Court views this evidence in the light most favorable to the defendants and presumes that Dr. Qadir reviewed the clinical notes from Falcon Ridge. *See Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 484 n.3 (7th Cir. 2007).

decision."); *May v. AT&T Integrated Disability*, 579 F. App'x 690, 692 (11th Cir. 2014) ("[A]n administrator's benefits decision is not arbitrary and capricious if it has a reasonable basis in the material available to the administrator at the time of the decision." (internal quotation marks omitted)). But as the Seventh Circuit noted in *Hess*, if it is easy for the administrator to obtain evidence that is obviously relevant to the coverage claim, the failure to do so can be arbitrary and capricious. *Hess*, 274 F.3d at 462–63. In this case, Dr. Qadir's failure to obtain Sofia's medical records—which were readily obtainable—means that his opinion was based on a partial view of the evidence, an additional factor indicating that Blue Cross's reliance on his opinion was arbitrary and capricious.

Second, Blue Cross relied exclusively on Dr. Qadir's conclusions even though he did not examine Sofia or speak with her treating physicians.[4] Although an administrator is not prohibited from crediting the opinion of a physician who conducted only a file review, *see Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006), relying on a file review that is contrary to treating doctors' opinions that have substantial medical support may be arbitrary and capricious, *see Hennen v. Metro. Life Ins. Co.*, 904 F.3d 532, 540 (7th Cir. 2018). This is particularly true in cases involving psychiatric diagnoses and assessments of risk. *Cf. Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBS Emps.*, 741 F.3d 686, 702 (6th Cir. 2014) ("[F]ile reviews are questionable as a basis for identifying whether an individual is disabled by mental illness."); *see also Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610

---

[4] It is not clear from the record what role, if any, Terri G.—the Falcon Ridge clinician with whom Dr. Qadir spoke—had in Sofia's treatment. But Sofia's treatment records do not indicate that she was ever treated or evaluated by Terri G.

(6th Cir. 2016) ("Evaluation of mental health necessarily involves subjective symptoms, which are most accurately ascertained through interviewing the patient and spending time with the patient, such that a purely record review will often be inadequate. . . ." (internal quotation marks omitted)). Although Blue Cross's reliance on Dr. Qadir's opinion is not arbitrary and capricious merely because he did not personally evaluate Sofia, the fact that he limited his review to paper records is relevant to the weight that can reasonably be given to his conclusions.

Finally, Dr. Qadir's opinion failed to acknowledge the reasons that Sofia's treating psychiatrist, Dr. Draper, found that residential treatment was required. Though the administrator need not defer to the opinion of a treating physician, "[a]dministrators may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." *Holmstrom*, 615 F.3d at 774–75 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (7th Cir. 2010)). In this case, Dr. Draper found that Sofia required residential treatment because living at home would result in frequent confrontations with her mother. He explained that Sofia "requires a period out of that environment in order to, in essence, permit the relationship to 'reboot' and permit both Sophia [*sic*] and her mother to make adaptive changes in their mode of interaction." Dr. Draper Evaluation, dkt. no. 87–1, at BCBSIL_0000243.

Dr. Qadir's contrary opinion, which was based on a partial file review and not an in-person examination of Sofia, unreasonably disregards Dr. Draper's medical judgment. Nothing in Dr. Qadir's opinion suggests that he considered the effects of Sofia returning to live at home in light of her difficult, combative relationship with her mother. It was unreasonable for Dr. Qadir to arbitrarily refuse to consider reliable

evidence that showed that living at home posed significant obstacles to Sofia's treatment, not to mention a danger to her mother.

In light of all of the factors described above, Blue Cross's decision to terminate coverage based on Dr. Qadir's opinion was arbitrary and capricious.

**B.     Appeals decisions**

Dominic next argues that Blue Cross's decisions rejecting his appeal of the coverage termination were arbitrary and capricious.  For those decisions, Blue Cross relied on the opinions of three evaluators who conducted file reviews.  The opinions of two of those evaluators—Dr. Timothy Stock and Dr. Benji Kurian—are substantially similar, so the Court will address them together.  The third opinion was prepared by an anonymous external reviewer.

**1.     Opinions of Dr. Stock and Dr. Kurian**

Dr. Stock, whose opinion is dated November 15, 2016, found that Sofia did not meet the criteria for residential treatment under the Milliman Care Guidelines.  Among his other findings, Dr. Stock noted that Sofia had not been prescribed medication, had been permitted to leave Falcon Ridge to attend events on two occasions, and was participating in therapy.  He observed that her parents were supportive, and he also noted that although Sofia had twice been put on self-harm watch, her records indicated that she lacked an active plan or intent to harm herself.

Dr. Kurian's opinion of March 24, 2017 largely restated Dr. Stock's conclusions. Indeed, the section of Dr. Kurian's opinion setting out his findings restates several sentences from the analogous part of Dr. Stock's report almost verbatim.  *Compare, e.g.*, Dr. Stock Opinion, dkt. no. 87–9, at BCBSIL_0007392 ("Pt would request to be put

on 'ghost status' which appears to be a way to deal with anxiety.  Parents were noted to be supportive.") *with* Dr. Kurian Opinion, dkt. no. 87–3, at BCBSIL_0002310 ("Pt would also request to be put on 'ghost status' which appears to be a way to deal with anxiety. Parents were noted to be supportive.").  Like Dr. Stock, Dr. Kurian concluded that Sofia did not meet the Milliman Care Guidelines for residential treatment.

Blue Cross's reliance on the opinions of Dr. Stock and Dr. Kurian is arbitrary and capricious because both doctors unreasonably ignored the weight of the medical evidence showing that Sofia continued to require residential treatment.  Neither doctor mentioned any of the four letters from medical professionals who had treated (or at the time were actively treating) Sofia, each of whom stated that residential treatment was medically necessary.  Though, as the Court mentioned previously, the evaluators were not required to defer to the opinion of her treating physicians, neither were they entitled to altogether ignore credible evidence of her need for residential treatment.

The defendants argue that Blue Cross was not required to include "volumes of explanation" for why it chose "not to defer to Sofia's treating providers."  Defs.' Resp. Br., dkt. no. 90, at 13 n.10 (citing *Nord*, 538 U.S. at 831).  Though the Supreme Court in *Nord* held that treating providers are not entitled to special deference, the Court also explained that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  Put another way, the administrator may reasonably disagree with the treating physicians' opinions, but it cannot "discount the near-unanimous opinions of . . . treating physicians" without explanation.  *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397–98 (7th Cir. 2009).  That is precisely what Dr. Stock and Dr. Kurian did, except that Sofia's

treating physicians were fully—not just nearly—unanimous in recommending residential treatment.

Perhaps most glaringly, Dr. Stock and Dr. Kurian failed to address the fact that an extensive, long-term regimen of outpatient treatment before her admission to Falcon Ridge had proven inadequate. They, like Dr. Qadir, apparently did not consider that Sofia's home environment posed particular challenges for her recovery that made residential treatment appropriate. As the letters of medical necessity from Nelson, Dr. Stevens, and Dr. Kalivas make clear, outpatient treatment was unsuccessful in large measure because of the problems that arose when Sofia lived at home. Indeed, the evidence indicated that keeping Sofia at home would be unsafe for her family members and for her. *See, e.g.*, Dr. Stevens Letter of Medical Necessity, dkt. no. 87–1, at BCBSIL_0000507 ("The home environment clearly was (from the objective information available) emotionally and physically unsafe for both Sophia and her family members."). The failure to so much as mention this aspect of Sofia's symptomatology—which was central to her treating providers' opinions that she required remain in residential treatment—shows that Dr. Stock and Dr. Kurian engaged in "selective readings" of the medical evidence. *Holmstrom*, 615 F.3d at 777.

Almost as problematic as Dr. Stock's and Dr. Kurian's failure to consider relevant medical evidence is the nature of the evidence they *did* consider. For example, both Dr. Stock and Dr. Kurian apparently found it significant that Sofia had been allowed to leave the Falcon Ridge campus to attend a benefit concert and volunteer at a marathon. They appear to have inferred that Sofia could not have been an acute danger to herself or others if she was permitted to attend those events. But as Dr. Stevens explained in

his letter, the appropriate level of care for Sofia was residential treatment rather than a more restrictive care environment, and he did "not believe that psychiatric hospitalization [was] indicated."  Dr. Stevens Letter of Medical Necessity, dkt. no. 87– 1, at BCBSIL_000510.  The fact that Sofia was not committed to some higher level of care—one where she would be prevented from leaving the premises of her treatment facility at any time—does not by any stretch of the imagination support a reasonable inference that she needed only the level of care associated with outpatient treatment. This is particularly true in Sofia's case, where the evidence shows that living at home and receiving outpatient care would significantly interfere with her treatment.

The other bases for Dr. Stock's and Dr. Kurian's opinions are equally dubious.  It is not reasonable to infer from the fact that Sofia had been attending therapy, for example, that her symptoms had abated to the point where residential treatment was no longer necessary.  This is especially true given the record evidence that Sofia continued to have difficulty acting appropriately during therapy sessions.  *E.g.*, 30-Day Review of Oct. 3, 2016, dkt. no. 87–1, at BCBSIL-0000483 ("Sofia continues to struggle with receiving feedback and is very defensive.").  The reviewing doctors also noted that Sofia was not on medication, but, as the Court previously mentioned, she was not prescribed medication at the time that Blue Cross initially approved coverage of residential treatment.  *See* Dr. Chadalavada Opinion, dkt. no. 87–7, at BCBSIL_0005924. Moreover, by the time Dr. Kurian performed his review, Dr. Stevens had prescribed Sofia an antipsychotic and antidepressant medication, but Sofia had refused to take it. By omitting any mention of this prescription, Dr. Kurian mischaracterized the medical evidence.

Dr. Stock and Dr. Kurian also noted that Sofia's parents were supportive. As the Court previously mentioned with respect to Dr. Qadir's opinion, Sofia's parents were supportive of her treatment from the outset, including when Blue Cross initially approved coverage for inpatient treatment. In other words, the support of Sofia's parents was a constant throughout her treatment, including during the period when Blue Cross recognized that she required inpatient care. Thus the fact that they continued to support her does not plausibly amount to evidence that her circumstances had improved such that residential treatment was no longer medically necessary. In addition, Dr. Kurian's opinion failed to acknowledge Dr. Stevens's observation that "[t]he conclusion that Sofia has a supportive family is not highly useful, in light of Sofia's bizaare [*sic*] hostility towards her mother, who has tried to be supportive. . . ." Dr. Stevens Second Letter of Medical Necessity, dkt. no. 87–3, at BCBSIL_0002044.

Although Dr. Kurian and Dr. Stock acknowledge that Sofia had been repeatedly put on self-harm watch, they evidently did not attach much significance to those incidents. The defendants seek to defend the reviewers' reasoning by noting that Sofia consistently denied suicidal ideation. But the medical records note that Sofia is not forthcoming with her treating providers about her behaviors. *See, e.g.*, Dr. Matsumori Evaluation, dkt. no. 87–1, at BCBSIL_0000577 (predicting that her "evasiveness and unwillingness may seriously interfere with progress" in therapy); Dr. Stevens Second Letter of Medical Necessity, dkt. no. 87–3, at BCBSIL_0002043 ("[S]he clearly does not articulate her thoughts and feelings openly to anyone. . . ."); Nelson Second Letter of Medical Necessity, dkt. no. 87–3, at BCBSIL_0002048 ("Sofia shows a pattern of compliance and refusal to participate in therapy or other aspects of the program."). The

fact that Dr. Stock and Dr. Kurian appear to have uncritically accepted her self-reported lack of intent to harm herself suggests that they engaged in a selective reading of the evidence, especially given that Sofia was put on self-harm watch on five separate occasions.

Finally, the defendants tout the fact that they authorized the internal review by Dr. Kurian, which they say was "above and beyond what is required by the Plan." Defs.' Resp. Br., dkt. no. 90, at 8. But the close similarity between Dr. Stock's and Dr. Kurian's opinions—including Dr. Kurian's near-verbatim repetition of Dr. Stock's findings—casts significant doubt on Blue Cross's claim these reviews were actually independent. Notably, the record contained significant new evidence at the time of Dr. Kurian's review, including three more instances in which Sofia was placed on suicide watch after Dr. Stock prepared his opinion. In addition, Dr. Stevens had prescribed the psychotropic medication Seroquel, which Sofia had refused to take. And both Dr. Stevens and Nelson wrote letters in early 2017 explaining the need for ongoing residential treatment in light of her recent oppositional and manipulative behavior. None of these developments is reflected in Dr. Kurian's opinion, suggesting that he merely parroted Dr. Stock's findings instead of conducting a truly independent review.

In sum, Blue Cross credited the opinions of consulting physicians who performed a file review even though those opinions failed to account in any meaningful way for the overwhelming evidence from her treating providers showing that residential treatment was medically necessary. In this case, as in *Holmstrom*, "the evidence provided by the doctors who examined her in person is so overwhelming that reliance on record-review doctors who selectively criticized this evidence is part of a larger pattern of arbitrary and

capricious decision-making." *Holmstrom*, 615 F.3d at 775.

**2.    Opinion of the external reviewer**

The other medical opinion that Blue Cross cites in support of its decision to terminate coverage is the opinion of the external reviewer from MCMC, LLC, a company that provides independent medical reviews.  The reviewer, who submitted his or her opinion anonymously, is a board-certified psychiatrist who conducted a file review but did not examine Sofia.  The reviewer initially found that residential treatment was excluded from the benefit plan.  Both the plaintiff and the defendants in this case agree that this was an erroneous interpretation of the plan exclusions.  In an addendum issued two weeks later, however, the reviewer stated that residential treatment was not medically necessary.

The circumstances of this addendum indicate that it should be given little weight. First, the reviewer based his or her initial opinion on an incorrect reading of the plan. The defendants argue that this misinterpretation was justified because the plan contained an ambiguity suggesting that residential treatment was both excluded and not excluded from coverage.  But the external reviewer's failure to note this inconsistency or the fact that residential treatment was at least arguably covered under the plan suggests that his or her review was cursory, unthorough, and potentially outcome-driven.  Moreover, the fact that the reviewer issued an addendum to shore up his or her erroneous finding does little to salvage the opinion.  As the Seventh Circuit has noted, an "after-the-fact approach" like the one taken by the external reviewer provides good reason to "question the reliability" of the reviewer.  *Davis*, 444 F.3d at 577.

But even if the circumstances of the external reviewer's medical necessity

determination did not significantly undermine its trustworthiness, the substance of the opinion is unreasonable. The relevant portion of the opinion consists entirely of the following three sentences:

> No the requested health service is not medically necessary. The patient could have been treated at a less intensive level of treatment. The patient was stabilized, she was volunteering, attending equine therapy and had no [suicidal or homicidal ideation] tendencies.

External Reviewer Addendum, dkt. no. 87–3, BCBSIL_0001612. For reasons the Court has already discussed with respect to the opinions of Dr. Stock and Dr. Kurian, Blue Cross's reliance on Sofia's "volunteering," attendance at therapy, and lack of suicidal or homicidal ideation to deny coverage is arbitrary and capricious. A perfunctory reiteration of the conclusions that other doctors reached—which, as the Court has explained, lack an adequate evidentiary basis—does not constitute reasonable grounds for Blue Cross to terminate coverage.

**D.    Milliman Care Guidelines**

Dominic also argues that Blue Cross's determination that residential treatment was not medically necessary was arbitrary and capricious because it relied on the Milliman Care Guidelines. For the reasons already discussed, however, Blue Cross's conclusion that Sofia's thoughts of harming herself and others were manageable at a lower level of care—i.e., outpatient treatment—was unreasonable in light of the medical evidence. The Court therefore need not decide whether it was reasonable for Blue Cross to use the Milliman Care Guidelines, because Blue Cross did not give Dominic's coverage claim the full and fair review to which it was entitled under ERISA. But the Court also notes that the limited administrative record at this stage is likely insufficient to address the numerous factual disputes that would arise in addressing the plaintiff's

argument about the Milliman guidelines.  *See, e.g.*, *Wit v. United Behavioral Health*, No. 14-cv-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019) (making extensive factual findings following a ten-day bench trial on the appropriateness of the defendant's care guidelines).

## E.    Remedy

Having found that Blue Cross's determination of medical necessity was arbitrary and capricious, the Court must determine the appropriate remedy.  In general, in deciding whether to remand the case to the administrator or to vacate the administrator's decision and award benefits, courts consider "what is required in each case to fully remedy the defective procedures given the *status quo* prior to the denial or termination of benefits."  *Schneider v. Sentry Grp. Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005) (internal quotation mark omitted).  The Seventh Circuit has distinguished between cases "dealing with a plan administrator's initial denial of benefits" and cases "where the plan administrator terminated benefits to which the administrator had previously determined the claimant was entitled."  *Id.*  Because Blue Cross initially determined that residential treatment was medically necessary before arbitrarily and capriciously reversing its decision, under *Schneider* the appropriate remedy is to vacate the administrator's decision terminating coverage.

In addition, remand would be inappropriate because this "case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."  *Hess*, 274 F.3d at 464.  Despite three internal reviews and one external review, Blue Cross has been unable to point to any opinion supporting denial of benefits that even remotely accounts for the overwhelming medical evidence showing

that Sofia required continued residential treatment.  In this case, as in *Holmstrom*, "the record provides [the Court] with a firm grasp of the merits of the participant's claim." *Holmstrom*, 615 F.3d at 779.  After exhaustively examining the administrative record, the Court can find no basis on which Blue Cross could reasonably refuse to reinstate coverage of Dominic's claim for coverage.

The parties dispute the appropriate amount of monetary recovery and whether the plaintiff should recover attorneys' fees and prejudgment interest.  Because the parties' briefs and the record before the Court do not provide sufficient detail to resolve these disputes, the Court concludes that ruling on damages, attorneys' fees, and prejudgment interest would be premature.

### Conclusion

For the foregoing reasons, the Court grants the plaintiff's motion for summary judgment and denies the defendants' motion [dkt. nos. 83, 89].  The case is set for a status hearing on June 27, 2019 at 9:30 a.m. to discuss what further proceedings are needed to bring the case to a conclusion.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 24, 2019